THE GALVESTON HOTEL CO. v. C. L. BOLTON.

1. SUBSCRIPTION OF STOCK.—A subscription of stock in an incorporated company, or in anticipation of a company, is usually in the shape of a mutual agreement, written and signed by those desiring to be corporators, or of a mutual undertaking in writing to be bound to

take a share or shares in an incorporation already created, in which the nature, object, and terms of the association are to some extent indicated. The company becomes a party to the contract resulting from this mutual agreement, either expressly or by implication, from the terms of the subscription.

2. STOCK — SUBSCRIPTION — EVIDENCE — CHARTER.—The Galveston Hotel Company was incorporated under a charter, which fixed the capital stock at two hundred and fifty thousand dollars, with power to increase it to one million; which provided that ten per cent. of the amount subscribed should be deposited with the treasurer at the time of subscription, and that the company should be organized whenever fifty thousand dollars of stock should be subscribed for. Suit was brought against Bolton as a subscriber for stock in the company on a subscription, in the following form, viz :

"Subscription to Galveston Hotel Co.

"C. L. Bolton, 5 shares....................................................... $2,500"

The original paper was not shown to have been in the hands of the company or its officers, but was lost, and Bolton's name was not found on the books of the company as a corporator or subscriber for stock; he never paid anything on the alleged subscription, and never participated in any action of the company, but acknowledged verbally to the secretary his obligation to pay, and asked indulgence : *Held*—

1. The fact that no percentage was ever paid on the alleged subscription was admissible in evidence, as tending to show that whatever was done was an incomplete transaction, and not a consummated act of subscription.

2. From the fact, that the charter allowed the company to be organized when shares to the amount of $50,000 had been taken, it does not follow that it could then enter fully on the performance of the enterprise for which it was chartered. Such a construction would render nugatory the provision of the charter which fixed the capital stock at $250,000.

3. The whole capital stock must have been taken before a call for payment could be lawfully made on a subscriber.

4. When there is no provision in the charter of a corporation to the contrary, he who takes the first share of stock takes it on condition, that all of the shares will be taken until the amount fixed as the capital stock of the company shall be taken, by persons who will be equally bound with himself to bear the expense of the enterprise, share and share alike.

5. *Quere*, whether, when the charter requires a subscription to be accompanied with the payment of a percentage of the share of stock subscribed, its payment is necessary to make the subscription valid?

6. *Quere*, whether, when the charter itself gives a remedy, by a sale of the shares of stock in default of payment of an assessment, an action can be maintained by the company against a defaulting subscriber.

APPEAL from Galveston. Tried below before the Hon. A. P. McCormick.

The Galveston Hotel Company brought suit against C. L. Bolton, to recover upon the subscription of said Bolton for five shares of its stock, valued at $500 per share. Bolton subscribed for the five shares before the organization of the company. About a month after the date of the subscription, he was called upon to pay the first installment, and promised to do so, but asked indulgence for a short time. Some weeks afterwards, payment was again demanded of him, and he again promised to pay, and requested a further extension. He subscribed for five shares, at $500 per share, in a book in the hands of E. B. Nichols, as appears from the testimony of one Thompson, as follows:

"Subscriptions to Galveston Hotel Company.
" C. L. Bolton, 5 shares    -    -    -    -    $2,500 "

The company was duly organized under its charter, and calls were made for installments upon subscriptions, both by publication and personal demand. Bolton never paid anything, either at the time of subscribing or afterwards, and suit was brought to recover the full amount of his subscription for five shares, viz, $2,500. A jury was waived, and the cause submitted to the judge, who rendered judgment for defendant; from which judgment the Hotel Company appealed.

Section 4 of the charter of the Galveston Hotel Company provides, that its "capital stock shall be divided into shares of five hundred dollars each, to be paid for in the following manner: ten per cent. of the amount subscribed for to be deposited with the treasurer of the company at the time of subscribing, and the balance at such times and in such amounts or installments as the board of directors may order."

Bolton paid nothing at the time of subscribing, and his name was not found in the books of the company as a corporator or subscriber for stock.

The case of the same plaintiff *v.* Barney Tiernan, was, by agreement, considered in connection with the case against Bolton. The only difference between the cases is, that Tiernan, after his subscription, and before the organization of the company, notified some of the solicitors that he wanted his name off the books, and would not pay his subscription. Tiernan also refused to pay when first called on.

*Ballinger, Jack & Mott,* for appellant.

I. The defendant's subscription was preliminary to the organization of the company under its charter. He became a partner in the intended undertaking. It was a contract, entered into between him and the other subscribers, and raised a mutuality which rendered him liable to the company after its organization. He agreed with the other subscribers that he and they would jointly perform a certain thing, which required their joint action to perform. Upon the strength of his subscription, he incurred obligations to the other subscribers (just as they incurred obligations each to the other) from which he could not be exonerated by his failure to pay the first installment at the time of subscribing. It was his duty to have paid it, and he cannot be permitted to avail himself of his own wrong.

[In support of this proposition, they cited Wight *v.* S. R. Co., 16 B. Monr., (Ky.,) 4; Vicksburg R. R. *v.* McKean, 12 La. Ann., 638; Mitchell *v.* The Rome R. R. Co., 17 Ga., 588; Smith *v.* Plank Road Co., 30 Ala., 655; Red River Co. *v.* Young, 6 Rob., (La.,) 30.]

II. Section 5 of the charter provided, that the company should be organized whenever fifty thousand dollars of stock should be subscribed for. Taking sections 4 and 5 together, it is very clear that the Legislature never intended that the payment of the ten per cent. should be a condition precedent

to the validity of the organization, or that such payment should be necessary to the validity of the subscription. On the contrary, it expressly declares that the company should be organized whenever fifty thousand dollars of stock should be subscribed for. If it intended that the company should not be organized until the stock should be subscribed for, and the ten per cent. paid, it would have said so; but it does not say so, either in direct terms or by implication. The organization of the company, after the $50,000 subscription, was perfectly valid, though not one cent had been paid in; and if this be so, it follows that the subscriptions were equally valid. The clause in section 4 provides no mode of subscription, and lays down no requisites for its validity. It merely provides the mode in which the stock shall be paid for. This was intended for the protection of stockholders against arbitrary demands of the directors, who could only require ten per cent. at the time of subscription, and ten per per cent. not "oftener than once within every thirty days." The directory could extend the time of payment of the original or any subsequent installment upon the stock, without in any way impairing the validity of the subscription, and, if they chose to do so, it was to the benefit of the subscriber, and he could not complain of it. We do not think it will be denied, that the organization of the company, after the requisite amount had been subscribed for, was perfectly legal, and we think it follows that the subscriptions themselves were valid, and can be collected by the company. This point was elaborately discussed in Mitchell v. The Rome R. R. Co., 17 Ga., 588, and, we think, decided by the court upon the soundest principles of reason.

[To support this proposition, counsel also referred and quoted at length from Vicksburg R. R. v. McKean, 12 La. Ann., 638, and Smith v. Plank Road Co., 30 Ala., 655.]

III. The testimony of T. E. Thompson, who was a canvasser for subscription and one of the incorporators named in the charter, shows that, after the organization of the com-

pany, he twice demanded of Bolton payment of his first installment, and that, on both occasions, Bolton admitted his liability, but asked an extension of time. Under the charter, the demand for payment of the first installment was not required to be made, until after the company was organized. He asked extension of time on account of immediate pressing need of money. The demand was again made, and again he asked an extension of time. In the mean time, other parties, who had entered into the contract jointly with him, were paying up. They had confidence in the *bona fides* of his subscription, and had a right to demand from him a compliance with the terms of the agreement. The company was at work, and we have a right to assume that the directors were making contracts and incurring obligations, predicated upon their entire subscription list. When approached on the subject by an incorporator, who was named in the bill, Bolton admits his liability, promises to pay, but asks a little time. He cannot be allowed to mislead others by his subscription, and then take advantage of his own wrong to avoid responsibility; and, by every principle of equity, he should be required to pay the amount he stipulated to pay.

We are aware that, in some of the States, the courts have held, that the payment of the first installment required by the charter was a condition precedent to the validity of the subscription. It was so decided by the Supreme Court of Pennsylvania, in Hibernia Turnpike Co. v. Henderson, 8 Serg. & Rawle, 219, but, as the court was divided on the subject, this case is not entitled to the weight it might otherwise receive.

The leading case, however, against us is the Union Turnpike Co. v. Jenkins, 1 Caine's Cases, (N. Y.,) 86, which was decided by the Court of Errors, and which is most frequently alluded to by courts that have held the same doctrine.

In this case, the Supreme Court of New York held, that the non-payment of the first installment did not affect the

validity of the subscription, (1 Caine's Reports, 381;) yet the decision was reversed by the Court of Errors, as before stated. The conclusion arrived at by the Court of Errors, in that case, has never been satisfactory to the professional minds of the country; and though the laws of the State of New York made the decisions of that court binding as authority in that State, the courts, even there, have been disposed to question its correctness. Other States, however, have either questioned which was the better authority, or have boldly announced the Supreme Court of New York to be of equal authority with the Court of Errors. The case was criticised in Piscataqua Ferry Co. *v*. Jones, 39 N. H., 499, *et seq.;* and the Supreme Court of Vermont, in Vt. Central R. R. Co. *v*. Clayes, 21 Vt., 35, say, that though the Court of Errors reversed the decision of the Supreme Court, it may be well questioned which is the better opinion. The Supreme Court of Alabama, (7 Ala., 674,) in speaking of the Union Turnpike case, use the following language: "We know that the Court of Errors of that State is composed of laymen, as well as judges, and cannot, beyond the limits of that State, be considered a higher authority than that of the Supreme Court."

*Gresham & Munn*, for appellee, contended that the facts in evidence did not constitute the appellee a subscriber to the capital stock of the company. They relied on the fact that the book in which Bolton subscribed, was at the time in the hands of one E. B. Nichols; that the company had not then been organized, and that Nichols had not been authorized to canvass for subscriptions. They cited Pittsburg and Stubenville R. R. Co. *v*. Gazzam, 32 Penn., 340; Angel and Ames on Corporations, secs. 229 and 231; New Bedford and Bridgewater Turnpike Co. *v*. Adams, 8 Mass., 141; Essex Turnpike Corporation *v*. Collins, 8 Mass., 297. They contended that no valid subscription could be made, unless ten per cent. of the amount of stock subscribed for was paid at the time of the subscription, relying on section 4 of the charter.

They also insisted that no valid assessment for the general purposes of the corporation could be made, until the minimum amount of capital stock, fixed by the charter, had been subscribed for, citing Salem Milldam Corp. *v.* Ropes, 6 Pick., 23; Worcester and Nashau R. R. Co. *v.* Hinds, 8 Cushing's R., 110; Penobscot R. R. Co. *v.* Dummer, 40 Maine, 172; Angel and Ames on Corp., sec. 146; Redfield on Railways, sec. 51, and cases there cited; Stoneham Branch R. R. Co. *v.* Gould, 2 Gray, 277.

*George Mason*, for appellee Tiernan, cited the following cases: The Salem Milldam Corp. *v.* Joseph Ropes, 6 Pick., 23; Central Turnpike Corp. *v.* Valentine, 10 Pick., 142; Penobscot R. R. Co. *v.* Dummer, 40 Maine, 172; Stoneham Branch R. R. *v.* Gould, 2 Gray, 277; Worcester and Nashau R. R. *v.* Hinds, 8 Cushing, 110; and also, 1 Redfield on Railways, 176, with the cases there cited. On the question that there was no contract of subscription: Turnpike Co. *v.* Collins, 8 Mass., 291; Pittsburg and Stubenville R. R. Co. *v.* Gazzam, 32 Penn., 340; New Bedford and Bridgewater Turnpike Co. *v.* Adams, 8 Mass., 141..

*Ballinger, Jack & Mott*, in reply, argued, at length, the proposition that the fact of two hundred and fifty thousand dollars, the amount authorized by the charter, not being subscribed for, did not affect the obligation of appellee, and cited the opinion of Mr. Justice Duncan, in Hibernia Turnpike Co. *v.* Henderson, 8 Serg. & R., 228. On the question of the non-payment of the ten per cent. at the time of subscribing, they cited Leighty *v.* President, 14 Serg. & R., (Pa.,) 434; and Angel and Ames on Corp., secs. 518, 519.

ROBERTS, CHIEF JUSTICE.—The questions in this case are, 1st, did appellee ever become a corporator in the company? and 2d, if he did, were the assessments legal and binding upon him? and 3d, was this suit properly brought to recover the amounts assessed against him?

These will be considered without any special reference to the division here made.

A subscription of stock in an incorporated company, or in anticipation of a company expected to be incorporated, is usually in the shape of a mutual agreement, written and signed by those desiring to be corporators, or of a mutual undertaking in writing, to be bound to take a share or shares in an incorporation already created, in which the nature, object, and terms of the association are to some extent indicated. Whether in one shape or in the other, the mutual agreement, or undertaking of all of the subscribers, may constitute the consideration for the agreement, or undertaking, of each one of them, so as to make it a valid contract in favor of and against each, to be carried out or enforced by the company when organized, if not already recognized. The company becomes a party to the contract, either expressly or by implication, from the terms of the subscription. An example may be here given, by way of illustration.

" *Contoocook Valley Railroad subscription for stock :*

" We, the subscribers, hereby agree to take the shares set against our names, being at $100, and to pay the amount in such assessments, as the directors for the time being may order, said subscription to be expended between Contoocookville and Henniker West village.

"Joseph Barnard, Jr.   -   -   Ten shares.
"H. E. Perkins   -   -   -   Twenty shares."

This subscription should be preserved in a stock book, or in some shape, as part of the papers of the company, being the foundation and evidence of the obligation of the subscribers.

Should it be deficient in its terms, so as not to contain an express obligation upon which to bring a suit, such facts should be stated in connection with, and in addition to it, as would show it to be a cause of action.

The petition in this case states the general conclusion, that

the defendant subscribed for five shares of stock, instead of setting out the subscription, with such other facts as would give effect to it as a contract, binding on the defendant in favor of the company. There is, however, no special exception to the petition on that account, and this specification of what should have been alleged is made, as showing the character of the evidence necessary to establish a cause of action against the defendant.

The subscription, upon which this suit was brought, was in form as follows:

"Subscription to Galveston Hotel Co.
"C. L. Bolton, 5 shares     -     -     -     -     - $2,500."

The facts proved in connection with this were, that it was seen before the organization of the company in the hands of one, who is not shown to have had any authority to procure subscriptions, written on a paper which is lost, and is not shown to have ever been in the possession of the company, or of its officers; the said Bolton's name is not found on the books of the company as a corporator, or subscriber for stock; he did not pay the ten per cent. upon his subscription, when it was made, if made as a subscription; has never paid anything on it, and has never participated in any action of the company, but after the organization of the company acknowledged to the secretary his obligation to pay his percentage, and begged time on it on two occasions, when his attention was called to it by the secretary.

The conclusion that these facts, in connection with that paper, would tend to establish, is, that it was carried around in an experimental effort to ascertain who would subscribe, and how much, rather than that it was a subscription in fact, and that his acknowledgment of his obligation to pay his percentage was prompted by a feeling of honorable, rather than of legal, obligation. (P. & S. R. R. Co. *v.* Gazzan, 32 Penn., 340.) It contains no express undertaking, and there are no sufficient facts proved to establish, in connection with it, an implied undertaking, and there is nothing to show that it

was ever a paper in the possession of, or belonging to the company.

There having been no percentage paid, is an important fact as evidence, tending to show that, whatever was done, was an incomplete transaction, and not a consummated act of subscription. That effect may certainly be given to it. It is contended that this fact alone is sufficient to relieve the defendant from responsibility as a subscriber, as in that event the company would not be bound to recognize him as a subscriber. The chief argument of counsel is on this point. There would seem to be very weighty reasons why, when a charter requires a subscription to be accompanied with the payment of a percentage of the share of stock, its payment is necessary to make the subscription valid. (Jenkins *r.* Union Turnpike Co., 1 Caine's Cases, 86 ; P. M. & Co. Hibernia Turnpike Road *v.* Henderson, 8 Serg. & Rawle, 217.) We are referred to decisions that hold differently. (Wright *v.* Shelby R. R. Co., 16 B. Monr., 4 ; V. S. & Texas R. *v.* A. C. McKeen, 12 La. Ann., 634 ; Mitchell *v.* The Rome R. R. Co., 17 Ga., 588.)

Upon the question also of whether this action by the company for the amount assessed can be maintained, when the charter itself gives a remedy, as was done in this charter, by a sale of the shares of stock, upon a default of the payment of an assessment, we find a conflict of decision. (1 Redfield on Railways, sec. 594 ; New Bedford & B. T. Corporation *r.* J. Q. Adams, 8 Mass., 137.)

Without deciding these legal questions, it will suffice to say, that the evidence was not sufficient to establish that the defendant was not a legal subscriber, so as to bind him for the assessments, as, we must presume, was the conclusion of the judge to whom the facts and law were submitted.

There remains to be considered the very important question of whether or not the company had a right to make these assessments, for the general purposes of the corporation, before the amount of $250,000 had been taken in

shares, that being the amount of the capital stock fixed by the charter, with a power to increase it to $1,000,000 by a two-thirds vote of stockholders.

It is argued by counsel for the plaintiff, that, as the charter allowed the company to be organized when shares to the amount of $50,000 had been taken, the intention was thereby indicated that the company should then enter fully upon the performance of the enterprise for which it had been chartered. That construction of the charter would render nugatory the most important provision of the charter, which is the amount of its capital stock, fixed at $250,000. That was the amount which the Legislature must have supposed would be sufficient to erect a first-class hotel in the city of Galveston. Their fixing it at that amount shows, that they did not believe that $50,000 would be sufficient for that purpose. There were good reasons for organizing the company, to be found in the increased facility of thereby raising the subscription to the amount fixed for the capital stock, and of other preliminary preparations for the execution of the work, when the subscription should reach that amount.

It is laid down by a law writer, that "it is an essential condition to making calls in those companies where the number of shares and the amount of capital is fixed, that the whole stock shall be subscribed before any calls can be lawfully made." (1 Redf. on Railways, sec. 51, p. 175.) This is supported by numerous authorities, and none in opposition to it have been cited by counsel, or found by us. (Salem Milldam Corp. v. Ropes, 6 Pick., 23; Stoneham B. R. R. Co. v. Gould, 2 Gray, 277; Central T. Corp. v. Valentine, 10 Pick., 142; Contoocook V. R. R. v. Barker, 32 N. H., 363; Penobscot R. R. Co. v. Dummer, 40 Me., 172; Littleton M. Co. v. Parker, 14 N. H., 543.)

In the above case, cited from 2 Gray, Chief Justice Shaw says: "This is no arbitrary rule. It is founded on a plain dictate of justice and the strict principles regulating the obligation of contracts. When a man subscribes a share to a

stock, to consist of one thousand shares, in order to carry on some designated enterprise, he binds himself to pay a thousandth part of the cost of such enterprise. If only five hundred are subscribed for, and he can have no assurance which he is bound to accept, that the remainder will be taken, he would be held, if liable to assessment, to pay a five hundredth part of the cost of the enterprise, besides incurring the risk of the entire failure of the enterprise itself, and the loss of the amount advanced towards it." Thus, when there is no provision to the contrary, the man who takes the first share of stock takes it on condition that all of the shares will be taken, until the amount fixed as the capital stock of the company shall be taken by persons who will be equally bound with himself to bear the expense of the enterprise, share and share alike. In principle, it is the same as if one would say, "I will be one of five hundred persons who will bind themselves to contribute equal amounts, not exceeding five hundred dollars each, in building a first-class hotel in Galveston." The proposition is not accepted and contract made so as to bind the proposer, if only two hundred and fifty persons join in it.

The evidence shows that the stock of $250,000 was never subscribed, and therefore, under the rule here announced, the assessments were unauthorized and illegal. If otherwise, this action could have been maintained.

Judgment affirmed.

AFFIRMED.